IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN GWIN, | ) | CASE NO. 1:25-cv-02221-JRA |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Brian Gwin ("Gwin") seeks judicial review of the final decision of the

Commissioner of Social Security, denying his application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")

applied proper legal standards, I recommend that the Commissioner's final decision denying

Gwin's DIB application be affirmed.

## II.      Procedural History

Gwin protectively filed for  DIB on Novembr 8, 2022, alleging a disability onset date of

August 22, 2022. (Tr. 225). The claims were denied initially and on reconsideration. (Tr. 90,

100). Gwin then requested a hearing before an ALJ. (Tr. 123-24). Gwin, represented by counsel,

and a Vocational Expert ("VE") testified before an ALJ on November 3, 2023. (Tr. 54-80).

Gwin and a different VE then testified before the same ALJ at a supplemental hearing on

August 15, 2024. (Tr. 35-53). Nine days prior to the supplemental hearing, on August 6, 2024,

Gwin had submitted a five-day letter requesting additional time to submit medical records

1

regarding mental health treatment he had received from Stacey Carabin, APRN-CNP. (Tr. 347). At the conclusion of the supplemental hearing, the ALJ agreed to leave the record open for 10 days to allow Gwin's attorney time to submit additional evidence. (Tr. 52). On August 29, 2024, with no records having been submitted since the supplemental hearing, Gwin requested an additional 14 days, until September 10, 2024, to submit records. (Tr. 503). On September 10, 2024 the ALJ issued a written decision denying Gwin's request for an additional 14 days to submit additional evidence and finding him not disabled. (Tr. 14-29).

The Appeals Council denied his request for review on August 19, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981). Gwin timely filed this action on October 17, 2025. (ECF Doc. 1). He asserts one assignment of error:

1. The ALJ committed reversible error by failing to admit evidence that the Plaintiff timely informed him about and that was material to the determination of disability.

(ECF Doc. 7, p. 1).

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Gwin was born August 4, 1987. (Tr. 28). He was 35 years old on his alleged onset date, making him a younger individual, age 18-49, according to agency regulations. (*Id.*). He has at least a high school education. (*Id.*). He has past relevant work as a systems administrator, DOT 168.167-030, SVP 8, sedentary exertional level; a systems consultant, DOT 030.167-010, SVP 8, sedentary exertional level; a network control operator, DOT 032.262-010, SVP 7, sedentary exertional level; and a user support analyst, DOT 032.262-010, SVP 7, sedentary exertional level. (*Id.*).

B.      **Relevant Medical Evidence**

On April 22, 2022, Gwin presented to the Inland Psychiatric Medical Group for management of his mood disorder. (Tr. 527). He had been prescribed Wellbutrin, Abilify, Zyprexa, and Lamictal, and while this regimen had been partially effective, he had been experiencing increasing symptoms of depression including, sadness, fatigue, some crying, lack of interest, and insomnia. (*Id.*). He was assessed with bipolar disorder, current episode mixed, moderate, and generalized anxiety disorder, and Prozac was added to his regimen to better manage his depression. (Tr. 527-28). At a subsequent medication management appointment on May 9, 2022, Gwin reported that his current regimen was effective, and denied any side effects. (Tr. 530). He reported stable mood, appetite, energy, concentration, and sleep. (*Id.*). At his June 23, 2022 medication management telemedicine session, Gwin was described as alert and oriented, able to follow commands and communicate in complete sentences, with euthymic mood and full affect, intact thought process and thought content, and with a good grasp of recent and distant memories. (Tr. 533).

On August 24, 2022, Gwin was discontinued on Abilify to minimize impulsivity and overspending, his dosages of Zyprexa and Prozac were increased to better manage his mood disorder and depression, his dosage of Wellbutrin was lowered to minimize over-activiation, and he was continued on Ativan on an as needed basis to manage severe anxiety. (Tr. 540). On September 27, 2022, Gwin described the medication regimen as "partially effective," and reported increasing anxiety manifested by feelings of being trapped, feeling fearful and helpless, increased sweating, chest tightness, muscle tension, fatigue, difficulty concentrating, restlessness, and increasing insomnia. (Tr. 545). To manage his anxiety, his dosage of Wellbutrin was decreased, he was discontinued on Ativan, and he was prescribed Klonopin. (Tr. 546). Gwin

3

acknowledged that this regimen was effective on October 11, 2022 (Tr. 548), but stated it was "partially effective" on November 8, 2022, and reported increasing symptoms of depression including sadness, fatigue, some crying, lack of interest, and insomnia. (Tr. 551). His dosage of Wellbutrin was increased accordingly. (Tr. 552). On November 22, 2022, Gwin indicated that his symptoms had improved. (Tr. 554).

On February 22, 2023, Gwin attended a virtual visit for medication management and a diagnostic intake evaluation with Stacey Carabin, APRN-CNP, of Norwalk Hope419. (Tr. 563). Gwin reported that he had been struggling with his bipolar illness and anxiety since 2008. (*Id.*). He further stated that his mood had recently been "very well," rating it as 7 out of 10, but he also reported worrying about "everything," and described his anxiety as 8 out of 10, with 10 being the worst. (Tr. 563-64). He endorsed symptoms of social anxiety disorder and panic disorder, with his most recent panic episode occurring in August 2022. (Tr. 565).

At a follow-up appointment on April 3, 2023, Gwin reported that his mood and anxiety symptoms were continuing to improve, though he had some manic symptoms, including difficulty with sleep, some expanding of mood, and increased energy. (Tr. 680). On May 1, 2023, Gwin stated that he felt sedated and "zombie like" on his current medication regimen, and that he was sleeping more than 12 hours per day. (Tr. 663). He was started on lithum, but had intolerable gastrointestinal side effects, and discontinued after his initial dose (Tr. 655). He reported May 9, 2023, that he had been unable to sleep, but had then felt increased energy throughout the next day. (*Id.*). He described his mood as "irritated" and his stress as "increased." (Tr. 955-56). On June 5, 2023, he was doing well overall with regard to mood and anxiety symptoms, and said he had recently gone to Las Vegas with his roommate, and he was back to riding his motorcycle. (Tr. 651).

4

By July 5, 2023, Gwin reported "doing very well overall with regards to mood and anxiety symptoms," though he was experiencing some insomnia and other tolerable side effects. (Tr. 647). His mood had improved once he was able to sell his house, and it was further enhanced when he was able to ride his motorcycle. (*Id.*). He had been reaching out to his neighbors, and was considering joining a weekly social group with other motorcycle enthusiasts. (*Id.*). He reported some hypomanic symptoms including a desire to spend money, though he had mostly managed his spending impulsivity. (Tr. 648). On August 2, 2023, Gwin stated he was frequently riding his motorcycle, visiting his parents often, planning for increasing travel and engaging more in his hobby of photography. (Tr. 643). On November 15, 2023, however, Gwin reported gradual worsening of his depression symptoms, along with decreasing interest in activities he typically enjoyed. (Tr. 634). His depression had improved by November 20, 2023, but his anxiety and social anxiety remained present. (Tr. 630). He was assessed as hypomanic with mixed features, though he had good eye contact; full, reactive affect; no psychosis; no suicidal ideations; linear, logical, goal directed thoughts; no abnormal thought associations; clear speech; intact attention and concentration; good insight; and intact judgment. (Tr. 631).

Gwin attended a consultative psychological evaluation with John Reece, Psy.D., on March 19, 2024. (Tr. 711-17). He stated to the examiner that if he tries to work in a stressful environment, he spirals downward. (Tr. 711). He reported a history of suicide attempts, with the most recent in 2015. (Tr. 712). He described his mood as very anxious,and reported fluctuating amounts of sleep ranging from 3 to 16 hours per night. (Tr. 713). He has some depression, and feels hopeless, helpless, worthless, and full of guilt. (*Id.*). He has a history of manic/hypomanic episodes when he will need little sleep, have euphoric mood, and goal-directed behavior involving photography and playing the ukulele, racing thoughts, excessive/pressured speech,

5

pleasure seeking behaviors, grandiose behavior, and suspiciousness and paranoia. (*Id.*). He has some anxiety around others, and has had panic attacks, though not recently. (*Id.*). He does have regular contact with his parents, his borther, and some friends. (Tr. 714). The consultative examiner assessed him with unspecified bipolar disorder and unspecified anxiety disorder. (Tr. 715).

On June 6, 2024, Gwin reported that he had recently lost all interest in the things he enjoys and he had been in bed throughout the day. (Tr. 750). He also reported manic episodes where he becomes irritable, starts projects he does not finish, lacks concentration, sleeps less than he usually does, and feels like he is capable of more than he is. (*Id.*). He was assessed with bipolar disorder, current episode depressed, moderate, and generalized anxiety disorder. (Tr. 729).

### C.  Medical Opinion Evidence

#### 1.  Treating Medical Source Opinion Evidence

Bipin M. Desai, M.D., opined on May 26, 2021, before the alleged onset date, that Gwin suffers from Seasonal Affective Disorder that generally starts late fall and goes through early spring. (Tr. 444). Dr. Desai, opined that this condition, in combination with his bipolar disorder, leaves him in a depression that renders him unable to work. (*Id.*). The amount of time he is unable to work could be reduced if he was in a warmer, sunnier climate. (*Id.*).

#### 2.  State Agency Reviewing Opinion Evidence

On February 15, 2023, state agency reviewing psychologist Sallie Boulous-Sophy, Ph.D., opined that Gwin had moderate limitations in the domains of interacting with others; concentration, persistence, and maintaining pace; and adapting or managing oneself. (Tr. 84). Dr. Boulous-Sophy further opined that Gwin was moderately limited in his ability to maintain

6

attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. (Tr. 86-87).

On May 9, 2023, state agency reviewing psychologist Aroon Suansilppongse, M.D., confirmed Dr. Boulous-Sophy's opinion that Gwin had moderate limitations in the domains of interacting with others; concentration, persistence, and maintaining pace; and adapting or managing oneself. (Tr. 95). Dr. Suansilppongse further found that Gwin was moderately limited in his ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to set realistic goals and make plans independently of others. (Tr. 96-97).

### 3. Consultative Examination Opinion Evidence

On March 19, 2024, Dr. Reece conducted a consultative examination of Gwin. (Tr. 711-17). He assessed that Gwin was able to follow directions in the examination and reported no problems in past work situations; that he had no difficulty with concentration during the examination, and had no history of performing repetitive tasks in past job settings; that he had a

history of sustained significant other relationships and no social problems in the workplace, although his paranoid and borderline personality traits are deficits; and that he had social supports; and although he reported no problems in the workplace in the past, current difficulties with emotional instability and symptoms of depression and anxiety could affect his stress tolerance. (Tr. 716). Dr. Reece opined that Gwin's ability to understand, remember, and carry out instructions were not affected by his mental health impairments; nor were his abilities to interact appropriately with supervisors, coworkers, and the public; to respond to changes in a routine work setting; to concentrate, persist, or maintain pace; or to adapt or manage oneself. (Tr. 718-19).

### 4. Other Medical Source Statements

Laura Wilkenson, RN, MS, CS, offered a medical source statement concerning Gwin's mental health on December 16, 2015, in the context of an FMLA assessment. (Tr. 327-30). Wilkenson opined that Gwin has instances of becoming severely anxious and will border on catatonia. (Tr. 328). During those periods he will become agoraphobic and apathetic to his environment, and will be unable to get out of bed to perform activities of daily living. (*Id.*). Wilkenson added that he "no longer experiences suicidal impulses, but is unable to function. This occurs more frequently during the winter months." (*Id.*).

On May 9, 2024, APRN Carabin wrote that Gwin had been diagnosed with Bipolar I Disorder, Generalized Anxiety Disorder, Social Anxiety Disorder, Panic Disorder, Agoraphobia, and certain sleep disturbances, and that these diagnoses were substantially limiting "one or more of his major life activities including historically sustained employment." (Tr. 721). Carabin further wrote that Gwin's "[m]ood episodes vary in intensity including extreme periods of

8

happiness, irritability, sadness, inability to experience joy, and neutrality; all of which may negatively impact one's daily level of functioning." (*Id.*).

### D. Administrative Hearing Evidence

Gwin testified before an ALJ on November 3, 2023. (Tr. 60-76). He testified that he is a college graduate, and that he is currently residing with a friend. (Tr. 60). He stated that he had left his most recent job due to "a wide range of factors" including anxiety about not knowing what he would be doing on a daily basis, and anxiety about having to make phone calls and meet new people. (Tr. 64). He had become depressed to the point of being suicidal in that job and had to resign. (*Id.*). Gwin added that he also had a history of anxiety at jobs that had set schedules and deadlines, sometimes to the point of becoming catatonic. (Tr. 65). He would spend up to an hour sending a one-sentence email to let his supervisor know he would not be coming in that day. (*Id.*). He had taken FMLA time, or short- or long-term disability, at every job he had previously had. (Tr. 66). His health has "vastly improved" because he has not worked in a month. (Tr. 67).

Gwin further testified that his anxiety causes his stresses, and his bipolar disorder "reacts" to the stress. (*Id.*). He can become either manic or depressive. (*Id.*). If he becomes depressed he can stay in bed for multiple days, and if he is manic he works more, sleeps less, has less concentration, and he will inevitably "crash." (*Id.*). He is more often depressed than manic, and he was more likely to be manic in the summer. (Tr. 68). He did not believe that his medications help to stabilize him. (*Id.*). He had trouble maintaining both personal and professional relationships. (*Id.*). During manic periods Gwin has trouble understanding or remembering instructions, and poor concentration, but during depressive periods he lacks energy and motivation. (*Id.*). He has social anxiety in groups of one to three other people, and when he

has to make small talk he tends to crash later. (Tr. 69). He has a "very large amount of anxiety" when around more than 10 people, though he has managed to attend a few concerts when he was able to remain seated and sit near an aisle. (*Id.*).

Gwin stated that he is unable to sleep more than three hours at a time and that has affected his ability to function. (Tr. 70-71). His fatigue has affected his ability to maintain a schedule, and he feels it is dangerous to go on a motorcycle trip. (Tr. 71). He spends a lot of his time playing video games, although he tends not to play when he is depressed. (*Id.*). He has one or two friends he likes to play games with, and he notes that he lacks the necessary concentration to play when he is manic. (Tr. 72). Gwin does not do household chores because he has an aversion to cleaning, and showers once weekly or less. (*Id.*). He owned a house for 1.5 to 2 years, and never mopped or vacuumed and rarely cleaned the toilets. (Tr. 72-73). He is afraid to do yardwork because he worries people are watching him. (Tr. 73). He becomes paranoid about having to get his mail, and will often wait until after dark to do so. (*Id.*).

Gwin reported he had moved to California after his divorce because he was unable to grocery shop, cook, or take care of himself. (Tr. 74). He had lived with his brother, but when his brother got married, Gwin had to move back to Ohio. (Tr. 75). His friend rented a U-Haul and made all arrangements, and they drove across the country together. (*Id.*). He is currently being treated at Hope419, where they prescribe his medications, and he attends counseling. (Tr. 75-76).

Once Gwin completed his testimony, VE Marisia Hall testified. (Tr. 77-79). VE Hall classified his past work as systems analyst, DOT 303.167-014, SVP 7, sedentary physical demand level; computer systems analyst, DOT 033.167-010, SVP 7, sedentary physical demand level; network operator, DOT 031.262-014, SVP 6, light physical demand level; and user support analyst, DOT 032.262-010, SVP 7, sedentary physical demand level. (Tr. 77-78). The ALJ

10

determined not to pose any hypotheticals to the VE because he felt there was not enough evidence in the file, and decided to instead send Gwin for a consultative examination. (Tr. 79).

A supplemental hearing was convened on August 15, 2024. (Tr. 35-53). Gwin's attorney stated that there were still outstanding records she intended to submit to the file, and indicated that "ten days should be more than sufficient" for production. (Tr. 38-39). Gwin testified that his condition was similar to what it had been at the prior hearing, although he had changed his medications to try to stabilize his mania, depression, and anxiety. (Tr. 42). He continued to be limited to three hours of sleep per night, which impacted his ability to socialize or work. (Tr. 42-43). He had been experiencing anxiety attacks about twice per month. (Tr. 43). He had recently missed a concert and a motorcycle race he had planned to attend due to severe anxiety. (*Id.*). He continued to ride motorcycles, play guitar, play video games, and do photography. (*Id.*).

VE William Boyd next testified that Gwin's past work consisted of systems administrator, DOT 169.167-030, SVP 8, sedentary exertional level; and systems consultant, DOT 030.167-010, SVP 8, sedentary exertional level. (Tr. 49). For his first hypothetical, the ALJ asked the VE to consider an individual of the same age, education, and work history, who can perform work at all exertional levels, and can perform simple tasks, not involving a fast production rate, not involving more than occasional and superficial contact with coworkers and supervisors, with superficial defined as not involving persuasive evaluation, negotiation, conflict resolution, or anything more than a straightforward exchange of information. There can also be no face to face contact with the public. The individual has the ability to maintain attention and concentration for at least two hour segments and to adapt to occasional changes. (*Id.*). The VE opined that this individual could not perform Gwin's past relevant work but could work as a packer, hand, DOT 920.587-018, SVP 2, medium exertional level, with an estimated 71,000 jobs

nationally; as a cleaner II, DOT 919.687-014, SVP 1, medium exertional level, with an estimated 53,000 jobs nationally; and as a laundry worker, DOT 361.684-014, SVP 2, medium exertional level, with an estimated 6,000 jobs nationally. (Tr. 50). If that individual could not engage in team or tandem work, the VE opined that the analysis would not change. (*Id.*).

The VE further testified that typically off task rates above 10 percent on a regular and consistent basis is considered work preclusive, as is absenteeism above one day per month or a combination of coming in an hour more late or leaving an hour early. (Tr. 50-51). It would also be work preclusive if an individual would experience at least one anxiety attack during work hours that would result in his being off task for up to two hours or having to depart the worksite early. (Tr. 51). It would also be work preclusive if he needed to be able to work in isolation. (*Id.*). It would be an accommodation if the individual would need to be able to work at a job that is project-based and that would allow for a flexible schedule. (*Id.*). If that individual required routine, occasional supervision, that too would be work preclusive. (Tr. 52).

## IV. The ALJ's Decision

In his decision dated September 10, 2024, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2027.

2. The claimant has not engaged in substantial gainful activity since August 22, 2022, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: bipolar disorder I; depressive disorder; anxiety and panic disorders (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all

12

exertional levels but with the following nonexertional limitations: he can perform simple tasks, not involving a fast production rate and not involving more than occasional and superficial contact with coworkers and supervisors, with superficial defined here as not involving persuasion, evaluation, negotiation, conflict resolution, or anything more than the straight-forward exchange of information, and also not involving face-to-face contact with the public. He can maintain attention and concentration for at least two-hour segments. He can adapt to occasional changes.

6.  The claimant cannot perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on August 4, 1987, and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skill (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a,).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 22, 2022, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-29).

## V.    Law and Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.  whether the claimant is engaged in substantial gainful activity;

2.  if not, whether the claimant has a severe impairment or combination of impairments;

3.	if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.	if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.	if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.	Standard of Review**

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

14

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.    Discussion

Gwin raises a single issue for this Court's review: Whether the ALJ committed reversible error by failing to admit evidence that the Plaintiff timely informed him about and that was material to the determination of disability.

15

(ECF Doc. 7, p. 1).

> **A.** **The ALJ did not abuse his discretion in denying Gwin's additional request for an extension of time to submit evidence.**

Gwin argues that the ALJ erred in failing to grant an extension for the his attorney to submit additional evidence to the record. (*Id.* at pp. 11-14). Gwin contends that he abided by the "five-day rule" that required him to submit notification to the ALJ, and that the evidence in question falls under an exception to the rule that allows for submission of the additional evidence received past the deadline if the claimant actively and diligently sought the evidence but did not receive it before the deadline. (*Id.* at p. 12 (citing 20 C.F.R. § 404.935(b)(3)(iv))). Gwin argues that by submitting a letter nine days in advance of the hearing notifying the ALJ of outstanding evidence, discussing that evidence at the hearing, and updating the ALJ of his attorney's efforts to gather the evidence, he established that the delay in submitting the evidence was beyond his control. (*Id.* at p. 13). As he believes the additional evidence may have had a bearing on the ALJ's assessment of his treating source's opinion of his condition, Gwin claims that the failure to accept the evidence was in error. (*Id.* at p. 14).

The Commissioner responds that this Court must apply an abuse of discretion standard when reviewing the ALJ's application of the "five-day rule" in 20 C.F.R. § 404.935. (ECF Doc. 8, p. 3). The Commissioner adds that 20 C.F.R. § 404.935(a) provides that the ALJ may decline to consider or obtain the evidence where the claimant has failed to meet the five day deadline unless good cause is shown, and that Gwin failed to show good cause. (*Id.*). Even if, as Gwin argues, his active and diligent efforts to secure the evidence rises to the level of good cause, his argument fails in the Commissioner's view because the ALJ satisfied the requirement to explain why he excluded the evidence. (*Id.* at p. 4). In his reply brief, Gwin contends that the ALJ's exclusion of the evidence amounts to an abuse of discretion as the Commissioner overstated the

opportunity the ALJ provided to submit the records, and ignored Gwin's compliance with the requirements of the five-day rule and the exception that permits the late submission of evidence. (ECF Doc. 9, p. 2).

Agency regulations require that claimants submit available written evidence to the ALJ "no later than five business days before the date of the scheduled hearing." 20 C.F.R. § 404.935(a). If the evidence is not available, the claimant "must inform" the ALJ of the missing evidence and "must make every effort to ensure the [ALJ] *receives* all of the evidence." *Id.* (emphasis added). Claimant's counsel must "[a]ct with reasonable promptness to help obtain the information or evidence." 20 C.F.R. § 404.1740(b)(1). Where the claimant does not comply with the five-day requirement to submit or inform the ALJ of the evidence, the ALJ "may decline to consider or obtain the evidence" unless good cause is shown, according to the circumstances described in § 404.935(b), which states:

> [T]he administrative law judge will accept the evidence if he or she has not yet issued a decision and you did not inform us about or submit the evidence before the deadline because:
>
> (1) Our action misled you;
>
> (2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you from informing us about or submitting the evidence earlier; or
>
> (3) Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier. Examples include, but are not limited to:
>
> . . .
>
> (iv) You actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing.

*See also Conrad v. Comm'r of Soc. Sec.* No. 5:21-CV-00344, 2022 WL 1721200, at *7 (N.D. Ohio Apr. 22, 2022).

But even though the five-day rule permits a claimant to "inform" an ALJ of pending

evidence, the claimant's obligation does not end with a mere recitation of the efforts made to

obtain the untimely evidence. *Brandy K. v. Comm'r of Soc. Sec.*, No. 1:20-CV-694, 2022 WL

179541, at *6 (S.D. Ohio Jan. 20, 2022) (cautioning that "advocates seeking to protect their

clients' interests might be tempted to send a rote '5 day letter' that 'informs' of nothing at all, in

an attempt to keep the record open as long as possible"). Rather, Social Security Ruling 17-4p

explains that:

> To satisfy the claimant's obligation under the regulations to "inform" us about
> written evidence, he or she must provide information specific enough to identify
> the evidence (source, location, and dates of treatment) and show that the evidence
> relates to the individual's medical condition, work activity, job history, medical
> treatment, or other issues relevant to whether or not the individual is disabled or
> blind. If the individual does not provide us with information specific enough to
> allow us to identify the written evidence and understand how it relates to whether
> or not the individual is disabled or blind, the individual has not informed us about
> evidence within the meaning of 20 CFR 404.935, 404.1512, 416.912 or 416.1435,
> and we will not request that evidence.

2017 WL 4736894, at *3, *Conrad*, 2022 WL 1721200, at *7.

In *Haight v. Comm'r of Soc. Sec.*No. 22-1364, 2023 WL 3467042, at *1 (6th Cir. Jan. 18,

2023), the Court noted the standard for review for procedural issues in social security cases,

writing:

> Our review of the Commissioner's findings of fact, as set forth in an ALJ's
> decision, is limited to determining whether such findings are supported by
> substantial evidence. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir.
> 2010). With respect to matters of procedure, such as an ALJ's application of Section
> 404.935's five-day rule, our review is for an abuse of discretion. See *Smith v.
> Berryhill*, 139 S. Ct. 1765, 1779 n.19 (2019) (noting that the abuse-of-discretion
> standard applies to an ALJ's "overall conclusion" while substantial-evidence
> review applies to findings of fact); *Stout v. Kijakazi*, No. 20-36013, 2022 WL
> 445521, at *1 (9th Cir. Feb. 14, 2022) (applying abuse-of-discretion standard to the
> ALJ's refusal to consider evidence that was submitted in violation of Section
> 404.935). "An abuse of discretion exists when the [ALJ] applies the wrong legal
> standard, misapplies the correct legal standard, or relies on clearly erroneous
> findings of fact." *B & G Mining, Inc. v. Dir., Off. of Workers' Comp. Programs*,

18

522 F.3d 657, 661 (6th Cir. 2008) (quoting *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007)).

A review of the record here shows that Gwin timely submitted a five-day letter on August 6, 2024, nine days in advance of his supplemental hearing, indicating that he "has recently received mental health treatment by Stacey Carabin, APRN-CNP. She has worked at both Hope419 and Harbor Behavioral Health. Records have been requested from both facilities and will be submitted as soon as they are received." (Tr. 347). At his supplemental hearing, Gwin's attorney informed the ALJ that, "Mr. Gwin transferred treating providers from Hope419 to Harvard when his provider switched, so we're waiting on just the final records from Hope419 before he transferred to Harvard, so there's a little gap of records." (Tr. 37-38). Accordingly, the ALJ granted Gwin 10 days to submit the outstanding records. (Tr. 52). 14 days later, on August 29, 2024, Gwin requested 14 additional days to submit records, indicating that "[d]espite leaving several voicemails, I was only able to reach the provider today." (Tr. 503) He further indicated that Gwin would be signing a "special medical release" that afternoon, and that Gwin's attorney had "stressed to the provider that these records [were] needed ASAP." (*Id.*). On September 10, 2024, the ALJ issued his decision finding Gwin not disabled and denying his August 29, 2024 request to keep the record open, writing:

> [t]he claimant has had ample time to before and after both hearings to obtain and submit outstanding or additional evidence. As the evidentiary record is sufficient upon which to issue a decision, additional evidence is not needed and thus, further delay is not warranted. Therefore I am denying this request.

(Tr. 17).

As the 6th Circuit noted in *Haight:*

Section 404.935 allows an ALJ to exclude untimely submissions at its discretion, so long as the submissions do not fall into one of Section 404.935(b)'s safe harbors. *See* 20 C.F.R. § 404.935. When an ALJ does exclude such evidence, he need not explain the decision at length; he need only give the reason for it. *See, e.g.*, *Stout*,

19

2022 WL 445521, at *1; *Fowler v. Kijakazi*, No. 20-36016, 2021 WL 5823704, at *2 (9th Cir. Dec. 8, 2021); *Stanley v. Comm'r of Soc. Sec.,* No. 20-CV-30, 2021 WL 1928540, at *2 (E.D. Ky. May 13, 2021); *Hight v. Comm'r of Soc. Sec.*, No. 18-CV-11817, 2019 WL 4866746, at *13–14 (E.D. Mich. June 25, 2019), *report and recommendation adopted by* No. 18-CV-11817, 2019 WL 3940854 (E.D. Mich. Aug. 21, 2019).

*Haight*, 2023 WL 3467042, at *2. Here, there was no abuse of discretion. While the record supports a finding that Gwin's counsel complied with he good cause examples outlined in 20 C.F.R. § 404.935(b), Gwin did not, however, satisfy his obligation to identify the written evidence and discern its relation to the determination of whether he is disabled. *See Conrad*, 2022 WL 1721200, at *8. Gwin did not provide specific information as required by SSR 17-4p regarding when treatment was provided by this source, or which of his medical conditions or treatments are referenced in the outstanding evidence, and there is therefore no indication to the ALJ of what relevance the evidence has to the claim. Further, the ALJ articulated an appropriate explanation for his decision to exclude the evidence, noting that Gwin had already been provided ample time to secure the records, and the ALJ found the evidence in the file sufficient to form the basis of his decision. Thus, the ALJ was well within his discretion to deny Gwin's request for additional time to seek the outstanding medical records.

Gwin relies on *Justice v. Comm'r of Soc. Sec.*, No.13-cv-00836, 2014 WL 2803469 (N.D. Ohio June 19, 2014) to support his contention that the ALJ erred in failing to add material evidence to the record. (ECF Doc. 9, p. 5). I however, agree with the Commissioner's position that *Justice* is distinguishable from the case at hand, as *Justice* addresses a request pursuant to sentence six of 42 U.S.C. § 405 for consideration of new and material evidence as opposed to one relating to 20 C.F.R. § 404.935(b) which is implicated here. *Justice*, 2014 WL 2803469, at *9. Evidence is considered new if "it was not in existence or available to the claimant at the time of the administrative proceeding." *Ferguson,* 628 F.3d 269, 276 (6th Cir. 2010). *Ferguson*

20

defines evidence as material "only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." (*Id.*). The evidence in question here is neither new, nor has Gwin demonstrated it is material. Accordingly, this case is distinguishable from *Justice* and the ALJ did not err.

I therefore recommend that the decision be affirmed.

## VII.    Recommendation

Because the Administrative Law Judge applied proper legal standards and reached a decision supported by substantial evidence, I recommend the Commissioner's final decision denying Gwin's application for Disability Insurance Benefits be affirmed.


Dated: July 22, 2026

Reuben J. Sheperd
United States Magistrate Judge


_____


## OBJECTIONS


### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

21

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)